UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KATHERINE B.,[1]

                              Plaintiff,                                 DECISION & ORDER

                v.                                                          20-CV-1898MWP

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

## PRELIMINARY STATEMENT

Plaintiff Katherine B. ("plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI").  Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 29, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned.  (Docket # 11).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 7, 8).  For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

_____

[1]  Pursuant to the November 18, 2020 Standing Order of the United States District Court for the Western District of New York regarding identification of non-governmental parties in social security opinions, the plaintiff in this matter will be identified and referenced solely by first name and last initial.

<u>**DISCUSSION**</u>

I.     <u>**Standard of Review**</u>

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

        A person is disabled for the purposes of SSI and disability benefits if he or she is

unable "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must

employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)

(*per curiam*). The five steps are:

    (1)    whether the claimant is currently engaged in substantial
            gainful activity;

    (2)    if not, whether the claimant has any "severe impairment"
            that "significantly limits [the claimant's] physical or mental
            ability to do basic work activities";

    (3)    if so, whether any of the claimant's severe impairments
            meets or equals one of the impairments listed in Appendix
            1 of Subpart P of Part 404 of the relevant regulations (the
            "Listings");

    (4)    if not, whether despite the claimant's severe impairments,
            the claimant retains the residual functional capacity
            [("RFC")] to perform [his/her] past work; and

    (5)    if not, whether the claimant retains the [RFC] to perform
            any other work that exists in significant numbers in the
            national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.      The ALJ's Decision

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims.  Under step one of the process, the ALJ found that plaintiff had not engaged in substantial gainful activity since September 14, 2018, the application date.  (Tr. 25).[2]  At step two, the ALJ concluded that plaintiff had the following severe impairments: obesity, asthma, hypertension, Type II diabetes mellitus, and arthritis/arthralgia.  (*Id.*).  The ALJ also found that plaintiff had several non-severe impairments, including left hand injury, status post right knee surgery, herpes simplex, allergic rhinitis, enlarged liver, minor right arm burn, superficial abrasion of the middle finger, and adjustment disorder.  (Tr. 18-20).  In addition, the ALJ found that plaintiff's complaints of carpal tunnel syndrome, headaches, mood disorder, and learning disorder were not medically determinable.  (*Id.*).  With respect to plaintiff's mental limitations, the ALJ found that she suffered from mild limitations in concentrating, persisting or maintaining pace, and no limitations in interacting with others, in understanding, remembering, or applying information, and in adapting or managing oneself.  (*Id.*).  At step three, the ALJ determined that

---

[2]   The administrative transcript (Docket # 6) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

plaintiff did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments in the Listings. (*Id.*).

The ALJ concluded that plaintiff retained the RFC to perform sedentary work but with certain limitations. (Tr. 21-28). Specifically, the ALJ found that plaintiff could occasionally climb ramps and stairs, balance, and stoop, but was unable to kneel, crouch, crawl, climb ladders and scaffolds, and reach overhead with her right arm. (*Id.*). Moreover, plaintiff was able to frequently reach, push and pull in all other directions up to the limits of sedentary work, with no restrictions on her left arm, and could have only occasional exposure to respiratory irritants and temperature extremes. (*Id.*).

At step four, the ALJ found that plaintiff had no past relevant work. (Tr. 27). At step five, the ALJ determined that other jobs existed in significant numbers in the national economy that, based on her age, education, work experience, and RFC, plaintiff could perform, such as charge account clerk, order clerk, and small parts inspector. (Tr. 27-28). Accordingly, the ALJ found that plaintiff was not disabled. (*Id.*).

III.   **Plaintiff's Contentions**

Plaintiff argues that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error. (Docket # 7-1). Specifically, plaintiff maintains that ALJ erred in failing to develop the record by ordering a consultative intelligence evaluation. (*Id.* at 7-11). In addition, plaintiff argues that the reaching and lifting limitations assessed by the ALJ are unsupported by any medical opinion and are based upon the ALJ's own lay opinion. (*Id.* at 11-15).

IV.   <u>**Analysis**</u>

"It is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding." *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013).  Given the non-adversarial nature of a Social Security hearing, "[t]he duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386).  Accordingly, before determining whether the ALJ's conclusions are supported by substantial evidence, a court must first evaluate whether the claimant was provided a full hearing "in accordance with the beneficent purposes of the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see Dougherty-Noteboom v. Berryhill*, 2018 WL 3866671, *7 (W.D.N.Y. 2018) (ALJ's duty to develop the record "is a threshold requirement for the SSA; the ALJ must develop the record prior to assessing whether a claimant is disabled"); *see also Archbald v. Colvin*, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he reviewing court must ensure that all of the relevant facts [are] sufficiently developed and considered") (quotations omitted).

Moreover, the "duty to develop the record exists even when the claimant is represented by counsel," *Munerlyn v. Colvin*, 203 F. Supp. 3d 253, 264 (W.D.N.Y. 2016), and is "enhanced when the disability in question is a psychiatric impairment." *Ramos v. Colvin*, 2015 WL 925965, *9 (W.D.N.Y. 2015) (quotations omitted).  The ALJ's duty to develop the record is not, however, without limits; specifically, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no

obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quotations omitted).

"The ALJ has discretion to order a consultative examination to further develop the evidentiary record[;] . . . [h]owever, the ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." *Monroe v. Comm'r of Soc. Sec.*, 2016 WL 7971330, *3 (N.D.N.Y. 2016), *report and recommendation adopted by*, 2017 WL 318838 (N.D.N.Y. 2017).  A consultative examination is necessary in order "to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. §§404.1519a[b], 416.919a[b]).  Accordingly, "it is a reversible error for the ALJ to fail to obtain a consultative examination if such an evaluation is necessary for the ALJ to make an informed decision." *Munerlyn v. Colvin*, 203 F. Supp. 3d at 264.

In her decision, the ALJ determined at step two that plaintiff did not have a medically determinable learning disability because "no physician or acceptable medical source since the SSI filing date diagnosed th[is] alleged impairment[]." (Tr. 18).  Having reached this conclusion at step two, the ALJ did not consider at step three whether plaintiff met or equaled the requirements of Listing 12.05 – the listing relevant to intellectual disorders – and did not incorporate any mental limitations in formulating plaintiff's RFC.  (Tr. 20-21).  Review of the record demonstrates that a consultative intelligence evaluation was necessary for the ALJ to properly determine whether plaintiff suffered from cognitive limitations and, if so, the extent of the limitations.  Accordingly, remand is warranted.

In connection with her application for benefits, plaintiff reported disability due, in part, to her learning disability and her third grade reading level. (Tr. 289). In connection with her previous application for benefits, plaintiff similarly alleged difficulties reading and spelling. (Tr. 269). Despite these allegations, a consultative mental evaluation was never ordered to assess plaintiff's mental capabilities. At the conclusion of the administrative hearing, plaintiff's attorney requested that the ALJ order consultative physical and intellectual evaluations of plaintiff prior to rendering a determination. (Tr. 76). Although the ALJ ordered a physical evaluation, she declined to order an evaluation of plaintiff's intellectual capacity. (Tr. 15, 1104-114).

The physical consultative examination was conducted on December 18, 2019 by Nikita Dave, MD. (Tr. 1104-114). Dave observed that plaintiff "has [a] learning disability and does not have a good ability to relay all history[;] [i]n fact, she is lost in terms of duration of symptoms or when a particular symptom started, onset, and other such details." (Tr. 1104). Plaintiff reported that she had attended special education classes through the eleventh grade and attempted to obtain her GED, "but the agencies . . . lost her certificate." (Tr. 1105). Dave diagnosed plaintiff with, among other impairments, a "cognitive impairment, learning disability with limited insight into medical history and answering questions." (Tr. 1107). Dave recommended that a psychiatric evaluation be conducted to evaluate plaintiff's cognitive impairment or learning disability. (*Id.*).

In addition to Dave's assessment, the record contains compelling evidence suggesting that plaintiff suffered from cognitive deficiencies. Her school records demonstrate that at age sixteen she was classified as "mentally retarded" and placed in a 15:1 special education classroom setting. (Tr. 439). At that time, her math and reading skills were below

grade level, with a 2.9 reading score and a 7.6 math score. (Tr. 441). Plaintiff was described as suffering from "a severe cognitive disability and significant deficits in communication/language and adaptive behavior." (Tr. 440). She reportedly required "highly specialized education and educational support systems." (*Id.*). Plaintiff's IEP indicated that her "[a]cademic scores [were] too low for placement in regular class" and that she spent half of each school day in a vocational program. (Tr. 437, 440).

A psycho-educational review completed by a school psychologist when plaintiff was in the tenth grade reported testing results suggesting plaintiff's cognitive functioning levels were in the "borderline to mildly retarded" range. (Tr. 437). According to the report, in 1992 the WISC-R was administered to assess plaintiff's intellect. (*Id.*). The results demonstrated that plaintiff had a verbal intelligence quotient ("IQ") of 64, a performance IQ of 78 and a full scale IQ of 69. (*Id.*). Testing conducted in 1999 revealed that plaintiff's academic skills ranged from "deficient to low average and far below age level." (*Id.*). The school psychologist reported that plaintiff's difficulties were "related to the long term effects of severe lead poisoning." (Tr. 438).

The record suggests that plaintiff received limited mental health treatment during the relevant period; her only mental health records relate to treatment mandated by family court when her youngest daughter was removed from the residence by child protective services. (Tr. 644-782). When she began that treatment, she reported that she had four children, but that her parental rights with respect to the oldest three had been terminated. (Tr. 655). Before her youngest child was removed, she had lived with plaintiff but was being raised by plaintiff's mother and believed that plaintiff was her older sister. (*Id.*).

The mental status examinations contained in plaintiff's mental health treatment notes routinely demonstrated minimal speech, mildly impaired recent and remote memory,

psychomotor retardation, indifferent attitude, distractibility, poor planning and judgment and limited insight.  (Tr. 644-782).  At times she also demonstrated poor hygiene, a blunted affect, lethargy, and was not fully oriented to time, with speech characterized by "loosening associations."  (*Id.*).

During one mental health treatment session, plaintiff reported that she did not expect to continue with the family court proceedings after being told that she was too "mentally handicapped" to be involved in the proceedings.  (Tr. 668).  Plaintiff also reported ongoing difficulties with memory, and her treatment provider referred her for evaluation by a neurologist. (*Id.*).  Nothing in the record suggests that plaintiff followed through with the referral.

During an appointment in April 2018, plaintiff reported that she lived with four other people including her friend, her ex-boyfriend, her mother, and her mother's friend. (Tr. 703).  According to plaintiff, she had previously attempted to live on her own but was unable to maintain an independent residence due to her inability to manage money.  (Tr. 705). Plaintiff reported difficulty managing household chores and that her house was infested with roaches and fleas.  (Tr. 656).  According to plaintiff she had never been employed due to her impaired memory and physical impairments, and she reported that her mother had told her that she had a "mental problem."  (Tr. 704).  Plaintiff was discharged from mental health treatment after the family court determined to terminate her parental rights to her youngest child. (Tr. 769).

Consistent with reports elsewhere in the record, plaintiff testified during the administrative hearing that she had obtained her GED, although the agency was unable to locate one.  (Tr. 50).  She also testified that she does not have a driver's license and has never been employed.  (Tr. 52-53). Plaintiff testified that she was unable to read and understand newspaper

articles.  (Tr. 68).  According to plaintiff, she once had attempted to live on her own but was evicted.  (Tr. 69-70).

She reported that she spends her days arranging her medical appointments and attempting to complete household chores such as washing dishes, sweeping, and caring for household pets.  (Tr. 54-55).  She testified that she typically relies upon her housemates to prepare meals, although she occasionally prepared meatloaf with her daughter when her daughter was still living with her.  (Tr. 56).  She also enjoys watching cartoons on television such as The Simpsons, My Little Pony, and Tom and Jerry.  (Tr. 58).  According to plaintiff, she enjoys playing bingo, Yahtzee, and WordZilla, which helps her to learn to spell.  (*Id.*).  She also socializes with friends through Facebook and email.  (Tr. 58-59).

Although "passing references in the record to a claimant's low intelligence do not trigger an ALJ's obligation to order intelligence testing, particularly where other evidence of record, such as the claimant's education, work history, and activities of daily living, does not suggest a severe cognitive impairment," *see Wallace v. Colvin*, 120 F. Supp. 3d 300, 305 (W.D.N.Y. 2015), this record contains far more than passing references to plaintiff's cognitive limitations; indeed, very little other evidence suggests that plaintiff is capable of normal functioning despite any cognitive deficits.  The record demonstrates that plaintiff experienced significant educational difficulties, lost custody of each of her four children, is unable to manage her own household, does not have a driver's license, and has never been employed.  Moreover, the only intelligence testing in the record reflects that she has a below average IQ.  Despite this, plaintiff's intellectual functioning has not been evaluated since she was in high school.  Further, apart from Dave's consultative opinion diagnosing plaintiff with a cognitive impairment or a learning disability and recommending further evaluation, the only other medical opinion in the

record assessing plaintiff's mental functioning was completed by a nurse practitioner, who only treated plaintiff's physical impairments.[3]  (Tr. 1148-149).  I find that this record is insufficient to properly assess plaintiff's cognitive limitations and that remand for further development of the record, including a consultative intelligence evaluation, is warranted.  *See Munerlyn*, 203 F. Supp. 3d at 264-65 ("[w]ith no medical evidence in the record related to [p]laintiff's alleged learning disability or intellectual impairments, the ALJ had a duty to develop the record with respect to those impairments and order a consultative examination[;] . . . [o]n remand, the Commissioner should obtain valid IQ scores for [p]laintiff and obtain a consultative psychological evaluation to assess [p]laintiff's mental capabilities"); *Jarvis v. Colvin*, 2016 WL 4148352, *6 (N.D.N.Y. 2016) (remanding for intelligence testing where plaintiff was in special education classes, failed to graduate, and continued to struggle with reading, writing, and basic math; "[b]ecause there was insufficient evidence [in] the record to determine whether or not [p]laintiff had a severe cognitive impairment, the ALJ had an obligation to develop the record by ordering intelligence testing"); *Wallace v. Colvin*, 120 F. Supp. 3d at 305 (remanding where record demonstrated plaintiff experienced educational difficulties, only completed the sixth grade in special education, and was unable to drive or manage personal finances; "[b]ecause the plaintiff's intellectual capacity cannot be reasonably ascertained from the evidence of record, the matter is remanded for the limited purpose of further developing the record with regard to plaintiff's cognitive limitations, including the obtainment of IQ testing"); *Major v. Astrue*, 2013 WL 2296306, *4 (W.D.N.Y. 2013) (remanding for further proceedings where plaintiff demonstrated "problems with attention, memory, expressive language, executive function, and visuospatial process," her cognitive screening tests demonstrated below expected levels, and her

---

[3]  State agency consultant V. Baronos, MD, reviewed plaintiff's medical records but determined that there was "insufficient evidence to make a determination."  (Tr. 83).

treating psychologists concluded a comprehensive neuropsychological evaluation was

necessary); *Dufresne v. Astrue*, 2013 WL 1296376, *8 (N.D.N.Y.) ("[because] the record

contains evidence of a cognitive impairment, with conflicting evidence as to [plaintiff's]

abilities, the ALJ should have ordered a consultative intelligence test in order to clarify

[p]laintiff's intelligence level and properly render a decision on whether [p]laintiff's mental

impairment is severe"), *report and recommendation adopted by*, 2013 WL 1289759 (N.D.N.Y.

2013); *Laveck v. Astrue*, 2012 WL 4491110, *7 (N.D.N.Y. 2012) ("the ALJ erred when he did

not consider [p]laintiff's learning disability at all stages of the disability analysis, when he failed

to satisfactorily resolve the 'different' results between [the medical opinions] . . . , and when he

failed to order a consultative intelligence exam"); *Fulmer v. Astrue*, 2010 WL 3239077, *11

(N.D.N.Y.) ("[b]ased on the evidence that [p]laintiff attended special education starting in the

second grade, has deficits in advanced math, deficits in language skills, and presented evidence

of an intellectual impairment, ALJ should have considered whether any intellectual deficits

impacted [p]laintiff's ability to work"), *report and recommendation adopted by*, 2010 WL

3239085 (N.D.N.Y. 2010).

        Having concluded that remand is required, I need not address any other specific

challenges to or perceived deficiencies in the ALJ's decision.  That said, for the benefit of

proceedings on remand, I note several instances in which the ALJ mischaracterized the record.

First, the ALJ characterized plaintiff's mental status examinations as being "generally benign

with only occasional symptoms noted."  (Tr. 19; *see also* Tr. 23 ("generally unremarkable mental

status examinations")).  To the contrary, during the mental status examinations, plaintiff

routinely exhibited minimal speech, mildly impaired recent and remote memory, psychomotor

retardation, indifferent attitude, distractibility, poor planning and judgment, and limited insight.

(Tr. 644-782).  Additionally, the ALJ observed that plaintiff's medical records demonstrated that she was capable of providing information about her health to her treatment providers.  (Tr. 19). The record, however, contains references suggesting that plaintiff was a poor historian, most notably Dave's consulting opinion.  (*See, e.g.*, Tr. 368 ("[v]ery poor historian"), 1104 ("claimant . . . does not have a good ability to relay all history")).  Similarly, the ALJ noted little evidence to suggest that plaintiff suffered from limitations in concentrating, persisting, or maintaining pace, and that she generally had appropriate grooming and hygiene.  (Tr. 19).  Yet, the record contains several references to plaintiff's distractibility and poor hygiene.  (*See, e.g.*, 387, 644, 645, 659, 667, 669, 673, 691, 708, 710, 724, 726, 745, 758).  In addition, although the ALJ found "no indication in the record that a walker or any assistive device was prescribed by a physician," the record in fact shows that plaintiff's treating orthopedic physician prescribed a walker.  (Tr. 24, 460).

Moreover, the ALJ mischaracterized plaintiff's testimony regarding her ability to read.  In her decision, the ALJ stated that plaintiff testified that she was unable to read. (Tr. 21-22 ("[plaintiff] then said she cannot read a newspaper"; "[t]he undersigned points out that this is in contrast to her testimony later in the hearing that she cannot read")).  Plaintiff never testified that she lacked all ability to read.  Rather, she testified that she was unable to read *and understand* a newspaper article and that she spent time during her day "trying to learn how to spell and read."  (Tr. 58, 68).  Considered in context, particularly alongside plaintiff's allegation in her application for benefits that she is only capable of reading at a third grade level, plaintiff's testimony suggests she is limited in her ability to read and comprehend, not that she is incapable of reading altogether.

14

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 8)** is **DENIED**, and plaintiff's motion for judgment on the pleadings **(Docket # 7)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.  On remand, the Commissioner should obtain an adult intelligence evaluation for plaintiff and, if warranted by the results, consider the requirements of Listing 12.05.  Additionally, the Commissioner should consider whether any further development of the record is necessary, including a psychological evaluation assessing plaintiff's mental functioning.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
February 17, 2023

15